## SWEET *vs.* GEISENHAINER.

*In the matter of the Estate of* GEORGE ARCULARIUS, *deceased.*

A residuary legatee will share in all portions of the estate which fall into the residue, notwithstanding a part of that residue consists of a sum directed to be invested for his use for life. The fact that the legatee of a partial interest is one of the residuary legatees, will not exclude him from taking the remaining interest in the latter character.

Though the testator may not have foreseen all the consequences of his dispositions, the effect of his language cannot be varied, when plain and unambiguous, in order to suit a supposed intention unwarranted by the words of the will.

Though the intention of the maker is the guide to the interpreter, the intent is to be sought from the writing, and from the known meaning and force of the words used, instead of resorting to conjecture.

J. T. HOFFMAN, *for Executors.*

As to whether the representatives of Jacob S. Arcularius are entitled to share in the $4,000 which was made a part of the residuum after Jacob's death, the counsel for the executors submit the following points.

I. The change made by the codicil in reference to the $5,000 invested for Jacob's benefit, shows a revocation of the testator's intention to give the sum to Jacob's heirs generally. It is given to *his issue* if he has any ; if not, then a *sum* being carved out of it for the widow, the balance falls into the residuum.

It is evident the testator intended if he had no grandchildren by Jacob, his own children should take the fund, and that it should not fall into strangers' hands.

II. The case of *Sweet* vs. *Chase*, 2 *Comstock's R., p.* 73, does not control this case. In *Sweet* vs. *Chase*, the money was expressly ordered to be *paid* to the widow, her *heirs or assigns*, without qualification—the Court held that a legacy payable after the legatee's death to her heirs or assigns, was valid, and that proposition is not disputed.

But here it cannot be pretended that the testator, having limited Jacob's interest in it to a life estate, and *taken the remainder away from his heirs*, meant in the same breath to give the fund or part of it back again, thus giving him absolutely when dead, what for good reasons he had simply given him the use of, while living.

III. It is not pretended that a gift in remainder to a life-tenant of a share in a fund in which he has a life interest, may not be valid in law, simply because it is something to be paid after his decease. But it is insisted that none but plain and unmistakable words can indicate an intention to make such a gift. And where, as in this case, a life interest in a fund is given to a legatee, and the fund itself at his death given to the *testator's children*, and there are chil-

dren living to take it, the most reasonable inference is that the testator meant the living children alone, and not the deceased life-tenant with them.    The gift here is a life estate to Jacob, with remainder to his children, if he has any; if not, then to the testator's own children.

IV. The residuum is to be divided among the children. The $4,000 as a divisible fund does not exist until one of them, Jacob, is dead.    The testator does not make any part payable to Jacob's heirs or assigns, but speaking as it were after Jacob's death, says, there being no issue of Jacob, let the children take the fund.    To suppose he meant other than living children, is to suppose an absurdity.

V. If the testator had intended to give Jacob the right to dispose by will of $\frac{1}{6}$ of $4,000 as the absolute owner thereof, after his death, (which is in effect what Jacob's administrator contends for), he would have said so in plain language.    It can scarcely be supposed his reasoning was so refined as to convince him that he was bringing himself directly within the limits of *Sweet* vs. *Chase.*    He would have taken a more simple way of expressing an intention that a dead child should share equally with five living ones.

VI. The testator made express provision for the widow by giving her a *certain part of the fund*, and then turned the residue in a different channel.    There is no evidence of an intention to give her more.    "*Expressio unius est exclusio alterius.*"    Yet if the construction contended for by the petitioner is correct, the testator intended to give her not only the $1,000, but a further sum, as Jacob's widow, entitled to a distributive part of Jacob's estate.

VII. If there can be a doubt in reference to this question, the consideration of the extrinsic facts, alleged and proven by the executors, will dispel it.    They show why Jacob's interest was limited to a life interest, instead of being an absolute gift as to the other children, and refute the proposition, that what was limited in life became absolute in death.

W. W. Drinker, *for Legatees.*

The Surrogate having decided that the 18th clause of the will of the testator is to be construed so that the rest, residue and remainder of his estate is to be divided among the children therein named, as soon as ascertained, and before the decease of the widow, and that Jacob S. Arcularius is also to be considered as included, the point now to be considered is, had Jacob a vested interest in the sum of $5,000, or any part thereof, so that his administrator can claim it upon his decease.

I. It is evident that the testator, at the time he made his will, had calculated and estimated the amount and value of his whole estate, for the purpose of disposing of it among his own children *only*, and for this purpose directed that it should be all sold, and converted into cash as soon as practicable at his decease.   Out of the proceeds, he wills one-third of the whole to be set aside and invested in good securities by his executors, the interest upon which to be paid to his wife Phebe A., during her life.   Out of the balance, he devises to his children by his first wife, and the issue of a deceased daughter by her, the sums named for each in the will.

To the children by his second wife Phebe, as also to his grandson Charles, he gives sums also named in his will, which are to be invested and the interest paid to each until they each attain the age of thirty years, when the amount to each is to be *paid* to them.

The sum of $5,000 is devised to his executors in trust to be invested and the interest to be paid to his son Jacob S. Arcularius, and upon *his* decease to be paid to his right heirs.

Having thus disposed of his whole estate as above, including some small legacies, and in the supposition that it might exceed his estimate, he devises all the supposed residue and remainder, together with the share set apart for his widow, to his children by her, upon her decease, to be equally divided *among* them.

II. There can certainly be no reasonable doubt as to the testator's will, in respect to the disposition of the $5,000 set apart on account of Jacob. It was placed in the hands of the executors for a specific purpose. It was determinately disposed of, as distinctly so as were all the other legacies, and *it*, together with those legacies from the *second* to the *seventeenth*, comprehended the supposed entire proceeds of the estate. The devise, therefore, in the 18th clause, did not comprehend *them* or *either* of *them*, but a balance that might remain after they were carved out of the estate, which, together with the widow's share, was to be equally divided among the children upon her decease.

Now whatever may be said of this rest, residue and remainder being vested in them, including Jacob, the $5,000 in question was not. It was devised in trust to the executors for the purpose of investment, and in the first place to pay the interest upon it to Jacob, and upon his decease to pay the principal to his right heirs. Such was the disposition of it by the will in the first instance. By the codicil, the last disposition of it was changed, and it was bequeathed as directed to be paid to Jacob's lawful issue, if he should have any; if not, then $1,000 was devised to his widow *if* he should leave one, and the balance of $4,000 to sink, *not* into the *rest, residue and remainder*, named in the 18th clause, but into the residuum of his estate, *which* (if the former, according to the decision in the matter, is to be divided before the widow's decease) is a contingent remainder, as the $5,000 is also contingent, but showing the testator's intention to provide for Jacob's support during his life, and to give the principal sum to his issue, if he should have any—if not, to provide for his widow, and that the balance should go to his other children, and not to strangers, or those who were not his lineal descendants.

III. Again, this $5,000 was not given to Jacob during his life, and upon his decease to his heirs, executors, or administrators; he had no power to will it if he died without issue, nor could he dispose of his life interest in the interest or

profits upon it, for the executors were bound to pay it to him only, so that he was not a life-tenant. It was not a gift to him as to the other children. It was not like the share set apart for his mother during her life, because the law fixed her right of dower, and this was accepted by her in lieu of it. The only thing that Jacob had any right to was the interest or profits upon it as it accrued semi-annually in the hands of the executors, and all that can be claimed by Jacob's administrator is any balance of interest that may have accrued up to the period of his decease. The testator had, beyond peradventure, cut him off from the principal sum, and can his will in this respect be rendered nugatory by a forced paradoxical construction which would do that which he willed should not be done? If he had intended that Jacob, or his personal representatives, should have had it, he would have said so plainly; can it be supposed that when he made the devise in the 18th clause to his children, that he ever supposed, or much less intended, the $5,000 would or ever could be included in it?

IV. Suppose Jacob had survived, which no doubt the testator contemplated, until after the distribution of the 18th clause, and then died, will it be contended that his personal representatives would be entitled to a division or proportion of the $4,000, or that Jacob's wife could have any share in it if living? It would then become the residuum which would sink into, or become the residuum estate of the testator, and which would then be divided among the surviving children of the widow of the testator, they being the offspring or the stock and root of the inheritance.

It is respectfully submitted that the cases of *Sweet* vs. *Chase*, 2 *Com.* 73, and *Coles* vs. *Brown*, 4 *Sand. C. R.*, 123, have no analogy to this case, as contended for on behalf of the counsel for the petitioner.

S. P. NASH, *for* WM. P. SWEET, *Administrator of* JACOB S. ARCULARIUS.

I. Jacob S. Arcularius was one of the residuary legatees described in the eighteenth clause of the testator's will, and

as such residuary legatee became entitled to one-sixth part of the residuary estate, as a vested interest on the death of the testator. This point is already decided in this case.

II. The pecuniary value of this interest must necessarily remain uncertain till the residuary estate is ascertained by the falling in of all the funds which may go to compose it; and the periods when certain portions of the fund shall become payable may depend on various contingencies; but none of these considerations affect the character of the interest which Jacob took as residuary legatee upon the death of his father. It was a vested interest, that could be assigned, devised, or pass to his legal representatives; and however uncertain the fund itself, in fact, its amount is to be considered in legal effect as comprising actually all the funds which it comprises potentially; in other words, which may eventually fall into it.

III. The only objection, therefore, to the representatives of Jacob taking one-sixth of the $4,000 which by force of the third article of the codicil fell into the residuary estate, is the incongruity of the bequest. But it is not so incongruous as to be impossible of execution, or to furnish any conclusive argument that the testator intended otherwise than the will provides. The bequest is in legal effect as follows: I bequeath to Jacob S. $5,000 for life, after his death the said sum to go to his children, if he die leaving issue him surviving; if he leave no children, then I give $1,000 of the said sum to his widow, the other $4,000 to fall into the residuum of my estate, in which Jacob S. is, by the prior terms of my will, entitled to one-sixth. In other words, it is a devise of $5,000 to Jacob for life, and of one-sixth of $4,000 thereof to him absolutely, provided he dies childless. So far from being a bequest impossible of execution, it is a clear provision of a life interest for Jacob, with an additional provision available for the benefit of his next of kin. (See *Sweet* vs. *Chase*, 2 *Comst.*, 73; *Coles* vs. *Brown*, 4 *Sandf.*, *Ch.*, 123).

A provision vesting an interest in a person to take effect

upon his death is analogous to the contract of life assurance, and perfectly valid and unobjectionable.

THE SURROGATE.—The provisions of this will have already been the subject of consideration by the court. (*Supra*, *p.* 64).

The question having now been discussed whether Jacob S. Arcularius is to be excluded as one of the residuary legatees, from sharing in the reversion of the fund directed by the codicil to fall into the testator's residuary estate, on his decease without leaving issue, after careful examination, I can see no sufficient reason for such exclusion. Had the testator designed this fund for the surviving brothers and sisters of Jacob, it was very easy to say so. He has not done this, but directed it to fall into the residuum of his estate. If it is not to go into the residuum, where is it to go? I cannot strike out the words, "sink into the residuum," and insert, "pass to his brothers and sisters by my present wife Phebe," which is about the effect of the interpretation demanded. The most that can be done with words of plain import, when incongruous with other portions of the will, is to reject them; but if that were done here, then the four thousand dollars would still pass to the residuary legatees, or to Jacob's next of kin. By the will, the whole sum is given over on his decease to his "right heirs." The codicil revokes this, gives it to his issue, and in case he dies without issue, one thousand dollars go to his widow, and the remainder passes into the residuary estate. If the gift over by the codicil cannot stand, it might be questionable whether the revocation would be sustained (*Jarman on Wills*, 154); while, on the other hand, if the revocation be held good, then, notwithstanding the rejection of the clause ordering the amount to sink into the residuum, it would take that direction by operation of law, as a remainder undisposed of. The words, "sink into the residuum," have a clear, intelligible meaning, needing no

construction or interpretation. They carry the subject matter into the residuary fund. The fact that the legatee of a partial interest is one of the residuary legatees, will not exclude him from taking the remaining interest in the latter character. (*Morgan* vs. *Surman*, 1 *Taunt.*, 289 ; 1 *Jarman on Wills*, 593). It often happens that a testator has not foreseen all the consequences of his dispositions, and yet this circumstance does not authorize the court to vary the effect of his language, when plain and unambiguous, in order to suit a supposed intention, unwarranted by the words of the will. (*Defflis* vs. *Goldschmidt*, 1 *Meriv.*, 417 ; *Mason* vs. *Robinson*, 2 *Sim. & Stu.*, 295 ; *Smith* vs. *Streatfield*, 1 *Meriv.*, 358 ; *Driver* vs. *Frank*, 3 *Maule. & S.*, 36, 49, 56). Though the intention of the maker is the guide to the interpreter, the intent is to be sought from the writing, and from the known meaning and force of the words used, instead of resorting to conjecture. There are well-established rules of construction which cannot be violated from a suspicion, that if the testator had foreseen the consequences of his disposition, he would have provided otherwise. Says *Sir John Leach in Bland* vs. *Lamb*, 5 *Mad.*, 412 : "The question is not what the testator had in his contemplation when he made his codicil, but what the words he has used will embrace, according to their ordinary signification, which must prevail unless qualified by other expressions in the instrument. A testator, when he gives his residue, may contemplate only the actual state of his property at the time, and may mean to give, and may think he is giving next to nothing, but such residuary legatee will nevertheless take an after-acquired million." And *Lord Eldon*, commenting on this rule, upon appeal, says it "has sometimes operated with great hardship, and directly contrary to the intention of the party." (2 *Jac. & Walk.*, 399). It cannot be contended in the present case that the testator did not intend the fund in question to sink into the residuum of his estate. In considering it as a part of the residuum, then, we follow his intention. Whatever is to become of it, it must go there, because he has so directed unqualifiedly.

What disposition is to be made of it, after it gets there, must depend on the residuary clause; and here again the language is clear and unequivocal. If it be urged as irrational to provide $1000 for Jacob's wife, and yet direct the remaining $4000 to sink into a fund, in which his widow might share in case of his intestacy, I can only say that it shows an intent to provide for Jacob's wife a sum certain beyond her husband's power. But if we reject that clause, this very same result might have followed by operation of law; and it can hardly be maintained that a disposition is to be overturned as absurd, when it is consonant with the rule of law and capable of a clear meaning. But it is not at all unusual to give a legatee a power of disposition over a remainder or reversion in property, and at the same time to leave a portion certain for the kin or the widow of the remainder-man, in which he has a previous life estate. If the testator had said, "I place $5000 in trust for Jacob during his life, and on his decease, without leaving issue, direct $1000 thereof to be paid to his widow, and one-sixth of the remaining $4000 to be paid to Jacob's executors, administrators or assigns," the will must have been carried out; and yet this is no more than what has been in effect provided under the clauses in question.

Again, if the gift had been to Jacob for life, and on his death to the testator's " children," it is argued that the surviving children would have taken. Perhaps so, but a form of expression like that, would have allowed a judicial construction of " children " so as to read " *other* children." The form of this bequest does not admit of that mode of interpretation. The words, " sink into the residuum," require no explanation. Nor is the court asked to explain them. The same remark applies to the language of the residuary gift. In fact, it is not a verbal interpretation that is required, but judicial interposition to prevent the legal effect and natural operation of words of plain meaning. The sense of the words and their force are admitted, and the other residuary legatees claim under the very provision which carries the $4000 into the residuary fund; but when it gets there,

they complain of one of the consequences directly flowing from its being there—viz., that the deceased legatee was entitled to a share of it. That a bequest of a residue to a life-tenant is not so irrational as to overturn the plain language of a will, may be illustrated by a number of authorities. Thus, in *Urquhart* vs. *Urquhart*, 13 *Simons*, 613, the testator directed one-half of the interest of the residue of his estate to be paid to his only child, and the other half to his wife, during their joint lives, and on their decease, if the daughter died without leaving issue, one-half of the capital was to be divided among his wife's "nearest of kin," and the other half among the testator's "nearest of kin." The legatees having died, the personal representatives of the daughter were held to be entitled to one-half of the capital in her right, as the next of kin of the testator at the time of his death, notwithstanding the daughter had been the life-tenant of that very half. The Vice-Chancellor, Sir Lancelot Shadwell, remarked, " But what I apprehend is really the rule, is that the persons who are designated by any description, must be the persons who answer that description, according to the legal sense of those words, unless on the face of the instrument you find that the testator himself has put a construction on those words, and show that he does not mean them to be used in their natural, ordinary and legal sense. That, I apprehend, to be the rule, and I find in this case nothing whatever to control or confine the effect of the words " the nearest of kin of me," except the mere surmise which arises from the circumstance, that the testator had before, in some sort or other, made a bequest to his daughter. That is the only circumstance, and my opinion is, that upon this will there is not enough to show that by the terms " the nearest of kin of me," the testator did not mean those who should be his " nearest of kin at the time of his death."

The same principle was determined in *Nicholson* vs. *Wilson*, 9 *Jurist*, 389 ; *Wilkinson* vs. *Garrett*, 10 *Jurist*, 560 ; *Seifferth* vs. *Badham*, 10 *Jurist*, 892 ; *Say* vs. *Creed*, 11 *Jurist*, 603, *and Scott* vs. *Moore*, 14 *Simons*, 35. In the latter case,

the testator gave twenty thousand pounds in trust for Elizabeth Bonell for life, and after her death, for her children; but if she died without leaving children, he directed the capital " should be considered as part of his personal estate and effects, and should be disposed of in a due course of administration." The rest, residue, and remainder of his estate was then given to the same person, Elizabeth Bonell. She survived the testator, and then died without leaving children. There was not a doubt entertained in the case, that if the £20,000 had been directed to sink into the residuum, Elizabeth Bonell would have taken it. The effort was to keep it out of the residue, it being claimed that the words, " due course of administration," carried it to the testator's next of kin. The court thought otherwise, and, without even hearing counsel for the residuary legatee's representatives, determined, against the testator's widow and next of kin, that the capital given over on the decease of the life-tenant, went by the terms of the will to the life-tenant, and she being dead, to her legal representatives. This is a strong case—much stronger, and carrying the doctrine further than the case now before me requires. The argument in all those cases was the same as urged here—that the testator could not have intended the life-tenant on whose decease the estate was given over, to take the capital or a share in the capital absolutely, or as put by the counsel in one of the cases that, having given a life interest " to his son, he could not have intended that in the event of the death of his son, it should still go to that son." It thus appears that the authorities fully bear out the conclusion at which I have arrived, that words of positive and plain meaning cannot be divorced from their obvious sense, by surmise and conjecture; and that the fact of a residuary legatee having been a life-tenant of a portion of the residuary fund, is not sufficient to deprive his representatives of a share of the very fund which he enjoyed for life, provided the words of the will unequivocally express such intent, and there is nothing on the face of the instrument to control the ordinary and natural force of the language employed. It

follows that the representatives of Jacob S. Arcularius are entitled to share in the residuary estate, and as part of it, in the $4000 directed by the codicil to sink into the residuum.